T.C. Memo. 2001-103

UNITED STATES TAX COURT

GERALD DENNIS STRONG, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 582-99.                    Filed April 30, 2001.

    P and his spouse were separated but legally married
when P prepared and filed a document as their joint 1994
income tax return, which P signed on behalf of his spouse.
Later, P filed a petition for bankruptcy.  R filed a proof
of claim in P's bankruptcy case alleging, inter alia, a
deficiency for 1994 arising largely from P's failure to
include income P received under a settlement agreement
between P and P's former employer.  P objected and contended
that the amounts received under the settlement agreement
were excludable from gross income under sec. 104(a)(2),
I.R.C. 1986.  The bankruptcy court overruled P's objection
and allowed R's claim for P's 1994 tax liability.  In the
instant case, R raises the affirmative defense of res
judicata, but not as to whether the 1994 tax return was a
joint tax return or was P's separate tax return.

    1.  <u>Held</u>:  R sustained as to res judicata.

    2.  <u>Held</u>, <u>further</u>, the income tax return filed for 1994
was intended by P and his spouse to be their joint income

tax return; it constitutes their joint income tax return even though P's spouse did not sign it.  See sec. 6013, I.R.C. 1986.


Gerald Dennis Strong, pro se.

Innessa Glazman, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CHABOT, Judge:  Respondent determined a deficiency in individual income tax and an addition to tax under section 6651(a)(1)[1] (failure to timely file tax return) against petitioner for 1994 in the amounts of $108,941 and $5,573.85, respectively.

After a concession by respondent,[2] the issues for decision are as follows:

> (1)  Whether under the doctrine of res judicata petitioner is barred by the order in In re Strong, No. 97-2-4433-DK (Bankr. D. Md., Aug. 25, 1998) from contesting his tax liability for 1994, except as that may be affected by the filing status of his 1994 tax return.

---

[1]Unless indicated otherwise, all subtitle and section references are to subtitles and sections of the Internal Revenue Code of 1986 as in effect for 1994.

[2]Respondent concedes the sec. 6651(a)(1) addition to tax. See infra note 4.

(2) If not so barred, then whether:

(a) Petitioner is collaterally estopped by the order from asserting that the amount of compensation he received in 1994 is excludable from gross income under section 104(a)(2).

(b) The discharge of indebtedness income petitioner received in 1994 is excludable from gross income under section 108(a)(1)(B).

(c) The income petitioner realized from the sale of stock in 1994 should be taxed at capital gains rates.

(d) Respondent erroneously calculated the amount of disability insurance benefits petitioner received in 1994.

(e) Respondent erroneously included loan proceeds in petitioner's gross income for 1994.

(3) Whether petitioner is entitled to the filing status of married filing jointly.

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

Petitioner resided in Sterling, Virginia, when he filed the petition in the instant case.

A.  Petitioner's Background and Employment History

Petitioner is a certified public accountant with an extensive educational background.  He holds bachelor's and master's degrees in accounting.  Petitioner also earned graduate credits toward, but did not complete, a Ph.D. degree in economics.

Petitioner began to work as a financial statement auditor for the accounting firm of Lybrand, Ross Brothers, Montgomery[3] in 1966.  Petitioner became a partner in the firm; he had that status during the period 1988-1991.

In August of 1991, the National Corporation for Housing Partnerships (hereinafter sometimes referred to as NHP) offered to petitioner the positions of executive vice president and chief financial officer.  In 1991, NHP was engaged in the business of building and developing subsidized housing in the United States. As part of its inducement to petitioner, NHP offered to him the right to participate in its stock option program, pursuant to which petitioner initially could receive up to 3,000 shares of NHP common stock.

Petitioner accepted NHP's offer and left the accounting firm.  At some point, petitioner also became treasurer of NHP.

---

[3]Through various transactions, the accounting firm of Lybrand, Ross Brothers, Montgomery has since become part of the accounting firm of PricewaterhouseCoopers.

Petitioner suffered a stroke in or about August of 1993. He was in rehabilitation from the effects of the stroke until December 31, 1994.

On September 20, 1994, petitioner and NHP executed a separation agreement pursuant to which petitioner (1) resigned his positions as executive vice president, chief financial officer, and treasurer, and (2) assumed the position of special assistant to the chairman for financial affairs. Petitioner's resignation was deemed effective as of March 31, 1994. The separation agreement further provided that petitioner's employment by NHP would end on December 31, 1994.

The separation agreement obligated NHP to compensate petitioner in the following manner: Through September of 1994, petitioner was to receive his full monthly salary, $19,500; for October through December of 1994, petitioner was to receive half of his monthly salary, $9,750.

The separation agreement provided that up to $6,000 of the monthly compensation petitioner was to receive could come in the form of disability benefits paid by NHP's insurer, Metro-Life Insurance Co. (hereinafter sometimes referred to as Metro-Life). NHP's obligation to compensate petitioner was offset, dollar for dollar, by the amount of disability benefits Metro-Life paid to petitioner. If the combination of the disability benefits Metro-Life paid and the compensation NHP paid to petitioner exceeded

the amount of compensation petitioner was entitled to under the separation agreement, then petitioner was required to return the excess to NHP.

As part of its August 1991 job offer to petitioner, NHP agreed to lend $60,000 to petitioner at 10 percent annual interest, repayable over 3 years. Pursuant to the separation agreement, NHP forgave the outstanding principal balances and all accrued and unpaid interest on the loans, which totaled about $44,000.

The separation agreement also required NHP to lend $15,000 (hereinafter sometimes referred to as the new loan) to petitioner at 10 percent annual interest. The new loan was to be repaid through payroll withholdings in the principal amount of $1,000 per payroll period together with interest thereon, beginning with the payroll check issued on September 23, 1994. The proceeds of the new loan were to be used principally to pay petitioner's medical bills. The separation agreement further provided that on the date petitioner exercised any or all of his option for NHP common stock, petitioner would immediately resell to NHP "at least the number of such shares equal in value to the outstanding principal balance and accrued interest on the New Loan." The separation agreement further provided that petitioner's option for 1,200 shares of NHP common stock had vested as of March 1, 1994. It required petitioner to exercise this option at $264.05

per share by September 30, 1994, and to resell to NHP the necessary number of shares (to pay off the new loan) at $300 per share. The separation agreement then states that this would result in "a net aggregate price of $43,200 if all 1,200 shares are resold."

By executing the separation agreement, petitioner also agreed to execute a release and waiver of claims, hereinafter sometimes referred to as the release agreement. Under the release agreement, petitioner promised to waive any and all claims he may have had against NHP whether or not connected with his employment by NHP. The release agreement recites that petitioner's agreements thereunder are in consideration for NHP's providing to him "certain payments and other valuable consideration, to which the Employee [petitioner] is not otherwise entitled, as set forth in the Separation Agreement." Petitioner executed the release agreement on September 20, 1994.

Petitioner's 1994 tax return includes a Form W-2c, Statement of Corrected Income and Tax Amounts, from NHP to petitioner, which provides the information set forth in table 1.

Table 1

| Form W-2 box | (a) As previously reported | (b) Correct information | (c) Increase (decrease) |
|---|---|---|---|
| 1  Wages, tips, other comp. | 188,990.49 | .00 | -188,990.49 |
| 2  Federal income tax withheld | 52,193.23 | 52,193.23 | .00 |
| 3  Social security wages | 60,600.00 | .00 | -60,600.00 |
| 4  Social security tax withheld | 3,757.20 | 3,757.20 | .00 |
| 5  Medicare wages and tips | 188,990.49 | .00 | -188,990.49 |
| 6  Medicare tax withheld | 2,740.36 | 2,740.36 | .00 |
| 17 State wages, tips, etc. MD | 96,983.70 | .00 | -96,983.70 |
| 18 State income tax | 6,647.34 | 6,647.34 | .00 |
| 17 State wages, tips, etc. VA | 64,967.70 | .00 | -64,967.70 |
| 18 State income tax | 3,507.47 | 3,507.47 | .00 |

The information reported on petitioner's tax return is consistent with the information in the "Correct information" column of table 1.

B. Petitioner's and Mary's Financial Arrangements

Petitioner and Mary J. Strong (hereinafter sometimes referred to as Mary) married in 1966; they remained married to each other during all of 1994.

By mutual agreement, petitioner managed all of their financial arrangements from the outset of the marriage. Without objection from Mary, petitioner did not consult her with respect to their financial arrangements.

From 1966 through 1997, petitioner prepared and filed their income tax returns. Each of these tax returns shows the filing status of married filing jointly. Petitioner customarily completed preparing their tax return on the last day for timely

filing. If Mary was present when petitioner completed the tax return for the year, then Mary signed it. If Mary was not present, then petitioner signed the tax return on Mary's behalf. Petitioner did not discuss with Mary either the contents or the substance of any of their tax returns.

Petitioner and Mary separated on or about July 5, 1990. Petitioner continued to manage Mary's financial arrangements while they were separated. The separation did not alter the manner in which petitioner managed their financial arrangements. Petitioner also continued to prepare and file their tax returns in the same manner as he had before the separation. Petitioner and Mary continued to elect the filing status of married filing jointly for the tax returns filed during their separation. The tax returns for 1990 through 1994 include Mary's income from her teaching job. Petitioner managed Mary's financial arrangements until August of 1997.

At some time before October 16, 1995, Mary gave her 1994 Form W-2 to petitioner. Petitioner prepared and signed a 1994 joint tax return for himself and Mary. On this tax return, petitioner reported $28,685 of Form W-2 income, consistent with Mary's Form W-2 from her teaching job, and did not report income from NHP, consistent with his Form W-2c. See supra table 1. On this tax return, petitioner claimed $54,729 withholding ($52,193.23 from his Form W-2c, plus $2,535.72 from Mary's Form

W-2), claimed the entire withholding as an overpayment, and directed that the entire overpayment be "Applied to Prior Taxes". Petitioner filed this tax return on October 16, 1995.[4] As of that date, petitioner and Mary were separated, but still legally married. Petitioner signed Mary's name on the tax return. Mary did not prepare a separate tax return for 1994 at that time because she understood that petitioner was preparing a joint tax return for them in accordance with the way their joint tax returns had been prepared up to that time. This pattern continued until August 1997.

Sometime during 1993, petitioner met with agents of the Criminal Investigation Division of the Internal Revenue Service to discuss his income tax liability. In July of 1996, petitioner was tried and convicted of failing to file Federal income tax returns for 1989, 1990, and 1991, in violation of section 7203.[5]

In August of 1997, respondent was in the process of conducting a civil audit of the joint tax returns petitioner and Mary filed for 1988, 1989, 1990, 1991, and 1994. Mary learned of

---

[4]Petitioner received an automatic 4-month extension for filing the 1994 tax return; he then requested and received an additional 2-month extension. Oct. 15, 1995, was a Sunday. The 1994 joint tax return was timely filed. See supra note 2.

[5]Mary testified that petitioner filed joint tax returns for the two of them, generally, and specifically for 1988, 1989, 1990, 1991, and 1994. The record does not indicate when these joint tax returns were filed, except for the 1994 tax return. As to the joint tax returns for 1988 through 1991, we gather that they were filed at some point before August 1997.

the severity of the investigation and the civil audit in August of 1997, after which she contacted Robert Beatson II (hereinafter sometimes referred to as Beatson), an accountant and attorney. Beatson immediately filed a power of attorney authorizing him to serve as Mary's representative with respect to the investigation and the audit.

Beatson represented to respondent that Mary (1) did not sign the returns, (2) did not authorize petitioner to sign the returns on her behalf, and (3) wanted to file separate returns for 1988 through 1991 and for 1994. Before August of 1997, Mary did not manifest an intention to file a separate return for 1994. Respondent's revenue agent, Howard Bell (hereinafter sometimes referred to as Bell), represented to Beatson that Mary could not file separate returns until the civil audit was concluded.

By a letter dated June 2, 1998, Bell informed Beatson that the civil audit was "essentially complete". Beatson then prepared married-filing-separately tax returns for Mary for 1988, 1989, 1990, 1991, and 1994. Beatson did not prepare separate returns for Mary for 1992 and 1993 because respondent (1) determined that there was no outstanding tax liability for those years, and (2) represented that the filing of separate returns for 1992 and 1993 would be administratively inconvenient. Beatson believed that Mary's interests vis-a-vis the statute of limitations as to 1992 and 1993 were adequately protected by the

1992 and 1993 tax returns and Bell's June 2, 1998, letter to Beatson in which Bell stated: "No audit was made of joint tax returns filed for 1992, 1993 and, [sic] 1995."

Mary's separate 1994 tax return was filed on or after July 12, 1998. Mary did not file a 1994 separate tax return before that date, even though her withholding was not enough to cover what would have been her 1994 tax liability on a married-filing-separately basis. On her separate 1994 tax return, Mary reported her Form W-2 income (rounded to $28,685) and taxable interest income ($184), for an adjusted gross income of $28,869. These are the same amounts that appear on the joint tax return, which also shows a breakdown on Schedule B, Interest and Dividend Income, of income by payor. On the separate 1994 tax return, Mary claimed the standard deduction for married filing separately--$3,175. The joint tax return shows $57,099 on Schedule A, Itemized Deductions, after applying the 7.5-percent floor for medical expenses and the 2-percent floor for miscellaneous deductions. Mary's separate 1994 tax return shows a $4,033 liability and, after a $2,536 credit for withholding (rounded from the Form W-2 amount), a $1,497 amount owed. The record does not indicate whether (1) Mary paid the amount owed, or any interest thereon, or any late filing addition to tax, or (2) respondent disallowed Mary's standard deduction because of section 63(c)(6)(A).

When petitioner filed the 1994 joint tax return, on October 16, 1995, both petitioner and Mary intended to file a 1994 joint tax return.

C.   The Bankruptcy Proceeding

On December 18, 1997, petitioner filed a petition for bankruptcy under chapter 13 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Maryland, Southern Division. Petitioner's case was later converted to a case under chapter 7. Laura J. Margulies (hereinafter sometimes referred to as Margulies), a bankruptcy attorney, represented petitioner in that bankruptcy case.

Respondent[6] filed claims for taxes, including claims for income taxes for 1988, 1989, 1990, 1991, and 1994, in petitioner's Bankruptcy Court proceeding.

Petitioner objected to respondent's claim.  As to 1994, he contended that he did not have any tax liability, that he had overpaid his 1994 taxes by $54,729, and that this overpayment had already been applied to his 1988 tax liability.  Petitioner argued in the bankruptcy case that income received from NHP in 1994 and the disability payments from Metro-Life were excludable from gross income under the provisions of section 104(a)(2).  The Bankruptcy Court conducted a hearing on respondent's claims and

---

[6]For simplicity and ease, we use the term respondent to include the U.S. Government, which was the party in the bankruptcy action.

petitioner's objections.  On August 13, 1998, the Bankruptcy

Court ruled from the bench that (1) respondent's claims as to

1988 through 1991 were not dischargeable under section

523(a)(1)(C) of the Bankruptcy Code, and (2) respondent's claim

as to 1994 was allowed.  In the course of this bench ruling, the

Bankruptcy Court made the following observations:

> Turning to the second problem, the objection to the
> claim for 1994 tax liabilities, which proof of claim
> has been filed by the Internal Revenue Service.
>
> The claim, of course, enjoys a prima facia
> validity under 502 [of the Bankruptcy Code], the debtor
> [petitioner] then came forward and introduced evidence
> which if concluded by the trier of fact to be a
> scenario which was proven, would in fact defeat the
> claim.  The debtor's theory is, of course, that these
> monies were received not as income which is taxable but
> as damages under settlement agreement of what the
> debtor asserts is a cause of action that would be
> included under 26 U.S.C. 104(a)(2).
>
> The burden then of establishing the entitlement
> falls back to the claim holder.  The facts are that the
> debtor had a stroke which for some period of time
> disabled the debtor and that while he was recuperating,
> his employer decided to terminate his employment, that
> there was a negotiated separation agreement which is in
> evidence as Government Exhibit 21, a part of which was
> a release and waiver of claims in evidence as Debtor's
> Exhibit 1 and pursuant to which, the debtor was paid
> certain funds.
>
> The IRS would categorize these funds as, in
> effect, severance pay which is a taxable income.  The
> debtor would categorize these funds as damages received
> by agreement on account of personal physical injuries
> or physical sickness, excludable from taxable income
> under 26 U.S.C. 104(a)(2).

                *     *     *     *     *     *     *

If this was found to be a payment to settle a claim under the ADA, the Court is not convinced that such payment would be, by law, excludable from income under 104(a)(2). Neither counsel has provided to this Court any decision dealing with an ADA settlement and the Court has not been able to find one by itself.

\* \* \* \* \* \* \*

[The Bankruptcy Court thereupon analyzed <u>Commissioner v. Schleier</u>, 515 U.S. 323 (1995), and <u>United States v. Burke</u>, 504 U.S. 229 (1992).]

And so, under the facts of the instant case before this Court, the compensation is not excludable as a matter of law under 104(a)(2). For these reasons, the Court denies the objection to claim filed and allows the claim of the IRS for the 1994 tax debt. Mr. Wilkinson, you will draw the orders.

(Whereupon, the case was concluded.)

The Bankruptcy Court memorialized this ruling by an order entered August 25, 1998, which provides, in pertinent part, as follows:

ORDERED that the debtor's tax liabilities for the years 1988, 1989, 1990, and 1991 are non-dischargeable under 11 U.S.C. § 523(a)(1)(C);

ORDERED that the debtor's objection to the Internal Revenue Service's claim for 1994 income tax is overruled, and that the claim is ALLOWED;

Petitioner did not appeal the order, which has become final.

U.S. Department of Justice attorney James J. Wilkinson (hereinafter sometimes referred to as Wilkinson) represented respondent in petitioner's bankruptcy case.

Petitioner met with Wilkinson during his bankruptcy case on two occasions:  Once when Wilkinson took petitioner's deposition, and once on the day of the hearing.  Other than the exchange of personal introductions at petitioner's deposition, Wilkinson did not meet with petitioner outside the presence of Margulies. Wilkinson did not represent to either Margulies or petitioner that (1) petitioner's 1994 tax liability was dischargeable, or (2) petitioner could contest his 1994 tax liability in a proceeding before this Court if the Bankruptcy Court overruled petitioner's objection.

The notice of deficiency in the instant case was mailed to petitioner on October 14, 1998.

## OPINION

Petitioner contends that (1) the compensation he received under the settlement agreement is excludable from gross income under section 104(a)(2), (2) the discharge of indebtedness income he received under the settlement agreement is excludable from gross income under section 108(a)(1)(B), (3) the income he received from the sale of his NHP stock should have been taxed at capital gains rates, (4) respondent erroneously included loan proceeds in petitioner's gross income, (5) respondent erroneously computed the amount of disability insurance benefits he received, and (6) he is entitled to the filing status of married filing jointly.

Respondent contends that (1) the doctrine of res judicata precludes petitioner from litigating every issue petitioner raised other than the filing status issue, (2) the doctrine of collateral estoppel precludes petitioner from litigating the section 104 issue, and (3) petitioner's filing status for 1994 is married filing separate. Respondent also raises alternative contentions with respect to every issue other than the filing status issue.

Without objection from petitioner, respondent filed an amended answer, the amendment raising the affirmative defense of collateral estoppel as to the section 104(a)(2) issue. Respondent then filed a motion for partial summary judgment that "Petitioner should be precluded from relitigating the identical issue previously adjudicated in the Bankruptcy Court pursuant to the applicable doctrine of res judicata, to wit: collateral estoppel (issue preclusion), or claim preclusion." The motion states that "if this motion is granted, there remains only one genuine issue of material fact for trial: whether or not petitioner is entitled to a filing status of married, filing jointly." Petitioner's memorandum in opposition to the motion states as follows:

I. ISSUE

Whether the doctrine of res judicata can be applied to a situation where petitioner was deliberately misled by the respondent into a course of action solely to achieve respondent's goal of tax maximization while

respondent's representative stated there were alternatives available to petitioner which, in fact, it now states now are not available due to, among other matters, res judicata.

Oral argument on respondent's motion was held at the calendar call for the Court's trial session on which the instant case had previously been set for trial.  The proceedings on respondent's motion ended with the following:

> THE COURT:  Would your attorney be able to -- your attorney in you[r] bankruptcy case be able to back up your contention that you were misled?
>
> MR. STRONG:  She would and the expert witnesses we had at the bankruptcy hearing would otherwise be able to do that.
>
> THE COURT:  At this point, the Court could not conclude that there is no substantial dispute about a material fact, and so Respondent's motion for partial summary judgment is denied.  However, Respondent's contention that -- I guess it's res judicata rather than collateral estoppel.
>
> MS. GLAZMAN:  Yes, Your Honor.
>
> THE COURT:  Respondent's contention that res judicata precludes a determination of those issues in Petitioner's favor in this case is never -- nevertheless has been properly raised and is still before the Court.

We consider first the matters involved in respondent's contentions as to preclusion, see Rules 39 and 41(b)(1),[7] and then we consider the parties' dispute as to petitioner's filing status.

---

[7]Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.

As a preliminary matter, we note that respondent's determinations as to matters of fact in the notice of deficiency are presumed to be correct, and petitioner has the burden of proving otherwise. See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). However, respondent has the burden of proof with respect to respondent's claim of res judicata because it is an affirmative defense. See Rules 39, 142(a); Calcutt v. Commissioner, 91 T.C. 14, 20-21 (1988).

## I. Res Judicata

Respondent contends that the doctrine of res judicata precludes petitioner from litigating the 1994 tax liability, except insofar as it is affected by petitioner's tax filing status. Petitioner contends that res judicata does not apply, because special circumstances exist which warrant an exception to the normal rules of preclusion. Respondent denies that the claimed special circumstances events occurred.

We agree with respondent.

Under the doctrine of res judicata--

> when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."

Commissioner v. Sunnen, 333 U.S. 591, 597 (1948)(citing Cromwell v. County of Sac, 94 U.S. 351, 352 (1877)); see Kroh v. Commissioner, 98 T.C. 383, 398 (1992). The judgment in the first

action thus puts an end to the cause of action, which the parties cannot later litigate upon any ground whatever, absent a showing of fraud or some other factor which would invalidate the judgment. See Commissioner v. Sunnen, 333 U.S. at 597; Kroh v. Commissioner, 98 T.C. at 398.

Three requirements must be satisfied for the doctrine of res judicata to apply: (1) The parties in the second case are the same as or in privity with the parties in the first case; (2) the cause of action in the second case is in substance the same as that in the first case; and (3) the first case resulted in a final judgment on the merits by a court of competent jurisdiction. See Nevada v. United States, 463 U.S. 110, 129-130 (1983); Federated Department Stores, Inc. v. Moitie, 452 U.S. 394, 398 (1981); Commissioner v. Sunnen, 333 U.S. at 597.

Petitioner and respondent were parties in petitioner's bankruptcy case. Thus, the first element of res judicata is satisfied. See, e.g., Florida Peach Corp. v. Commissioner, 90 T.C. 678, 682 (1988).

The second element of res judicata requires that the cause of action in the second case be in substance the same as the cause of action in the first case. Each taxable year "is the origin of a new liability and of a separate cause of action." Commissioner v. Sunnen, 333 U.S. at 598. If a claim of liability or nonliability for a particular tax year is litigated, then a

judgment on the merits "is res judicata as to any subsequent proceeding involving the same claim and the same tax year."  Id. Petitioner and respondent litigated petitioner's 1994 tax liability in the bankruptcy case, and petitioner now is attempting to relitigate his 1994 tax liability in the instant case.  Petitioner is thus attempting to litigate the same cause of action in the instant case as he litigated in the bankruptcy case.  The fact that petitioner raises different theories of relief in the instant case does not make the cause of action in the instant case different from the cause of action in his bankruptcy case.  It is well settled that the preclusive effect of a prior judgment extends not only to claims or defenses actually presented in the first case, but also to "any other admissible matter which might have been offered for that purpose."  Cromwell v. County of Sac, 94 U.S. at 352.  Each of the contentions petitioner asserts in the instant case was available to him during his bankruptcy proceeding.  Accordingly, the second requirement for res judicata is satisfied.

The third requirement of res judicata is that a court of competent jurisdiction enter a final judgment on the merits. Bankruptcy courts have jurisdiction to determine the tax liabilities of persons proceeding in bankruptcy court.  See United States v. Wilson, 974 F.2d 514, 518 (4th Cir. 1992); Freytag v. Commissioner, 110 T.C. 35, 40 (1998).  Thus, the

Bankruptcy Court which issued the order in petitioner's bankruptcy case is a court of competent jurisdiction.

The Bankruptcy Court's order also constitutes a final judgment on the merits. After conducting a hearing on the merits, the Bankruptcy Court allowed respondent's claim in a final order which petitioner did not appeal. On these facts, we conclude that the Bankruptcy Court's order constitutes a final judgment on the merits. See Turshen v. Chapman, 823 F.2d 836, 839-840 (4th Cir. 1987); Florida Peach Corp. v. Commissioner, 90 T.C. at 682-684; Holywell Corp. v. United States, 82 AFTR 2d 98-6313, 98-2 USTC par. 50,734 (W.D. Va. 1998), affd. without published opinion 229 F.3d 1142 (4th Cir. 2000). Accordingly, the third requirement for res judicata is satisfied. As noted above, the presence of fraud or some other factor which invalidates the judgment in the first action will prevent the application of res judicata even though the requirements therefor have otherwise been satisfied. Petitioner contends that (1) Wilkinson "set out on a deliberate course of misinformation and deceit" to entice petitioner into permitting the Bankruptcy Court to determine his tax liability for 1994, and (2) Wilkinson's alleged misrepresentations warrant an exception to the doctrine of res judicata. Petitioner contends that Wilkinson represented that (1) even if the Bankruptcy Court allowed respondent's claim for 1994, then petitioner's 1994 tax liability would be

discharged, (2) proceeding in the Bankruptcy Court would not prevent petitioner from relitigating the taxability of the amounts he received under the settlement agreement in a proceeding before this Court, and (3) permitting the Bankruptcy Court to determine petitioner's tax liability for 1994 would be quicker than permitting this Court to make the determination.

We disagree with petitioner for the following reasons.

Firstly, petitioner claims that, if he were not misled into inadvertently giving up his rights, he would have been able to have this Court rule on the merits of his tax contentions. At the time that, petitioner asserts, he was being lured into agreeing to allow the Bankruptcy Court to deal with his 1994 tax liability, (1) petitioner was already in the Bankruptcy Court because he filed a bankruptcy petition, (2) respondent had submitted in the Bankruptcy Court a claim for petitioner's 1994 tax liability, (3) the notice of deficiency had not yet been issued, and (4), of course, petitioner had not yet filed a petition with the Tax Court. Petitioner has not explained what practical course he would otherwise have followed in order to have the Tax Court rule on his tax contentions before the Bankruptcy Court ruled on respondent's claim, and thereby avoid res judicata. See, e.g., secs. 6503(h), 6213(f); McClamma v. Commissioner, 76 T.C. 754 (1981). Accordingly, we conclude that

petitioner failed to show that he lost anything even if we were to credit his claim that he was misled.

Secondly, we do not credit petitioner's claim that Wilkinson misled petitioner. On the basis of our observations of Wilkinson at trial, we believe he is a credible witness. Wilkinson testified, and we found, that he did not represent to petitioner or Margulies that petitioner's tax liability for 1994 would be discharged, or that petitioner could relitigate the issue of his 1994 tax liability in a proceeding before this Court.

Also, petitioner did not call Margulies as a witness to corroborate his contentions as to Wilkinson's alleged misrepresentations. With the exception of the exchange of introductions between petitioner and Wilkinson before petitioner's deposition in the Bankruptcy Court proceeding, Margulies was present for every conversation between petitioner and Wilkinson. Thus, if Wilkinson made the representations of which petitioner now complains, then Margulies would be able to confirm petitioner's allegations. Given these circumstances, petitioner's failure to call Margulies is suspect.

The absence of Margulies from the trial is even more suspect in light of petitioner's representation to the Court that Margulies and the expert witnesses petitioner called at his bankruptcy trial could corroborate his assertion that Wilkinson misled him as to the effects of permitting the Bankruptcy Court

to determine his tax liabilities.  From petitioner's failure to call Margulies to testify about this critical issue, we infer that if Margulies had testified, then her testimony would have been harmful to petitioner.  See O'Dwyer v. Commissioner, 266 F.2d 575, 584 (4th Cir. 1959), affg. 28 T.C. 698, 703 (1957); Stoumen v. Commissioner, 208 F.2d 903, 907 (3d Cir. 1953), affg. a Memorandum Opinion of this Court dated March 13, 1953; Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

On the basis of the foregoing, we conclude that there are no special circumstances present in the instant case which warrant an exception to the normal rules of res judicata preclusion.

We hold for respondent on this issue.[8]

## II.  Petitioner's Tax Filing Status

Respondent contends that petitioner filed a separate 1994 tax return, not a joint tax return, and relies on the following: (1) Mary did not sign the tax return that petitioner filed, and (2) Mary filed a separate tax return for 1994.  Respondent argues that Mary neither authorized petitioner to sign the 1994 tax return on her behalf, nor consented to the filing of a joint tax return for 1994.  Petitioner contends that he is entitled to the

---

[8]Accordingly, we do not consider (1) respondent's alternative contentions as to collateral estoppel, and (2) the parties' contentions as to the proper tax treatment of each category of petitioner's income or receipts from NHP.

filing status of married filing jointly because he and Mary had a continuing tradition of filing joint tax returns from the 1966 tax return through the 1994 tax return.

We agree with petitioner.

Spouses may file a joint tax return combining their income, deductions, and credits.  See subsecs. (a) and (d)(3) of sec. 6013.[9]  Numerous statutory provisions apply differently to married taxpayers depending on whether they have filed a joint tax return.  For purposes of the instant case, the major difference is in the tax rate schedules of subsections (a) and (d) of section 1, relating to joint tax returns and separate tax returns, respectively.  Under these provisions, the joint tax return tax rate brackets are twice as wide as the separate tax return brackets.

---

[9]Sec. 6013 provides, in pertinent part, as follows:

SEC. 6013.   JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE.

(a)  Joint Returns.--A husband and wife may make a single return jointly of income taxes under subtitle A [relating to income taxes], even though one of the spouses has neither gross income nor deductions, except as provided below:

*       *       *       *       *       *       *

(d)  Special Rules.--For purposes of this section--

*       *       *       *       *       *       *

(3)  if a joint return is made, the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several.

Under section 6061 and section 1.6013-1(a)(2), Income Tax Regs., a joint tax return must be signed by both spouses unless one spouse signs as agent of the other.  Notwithstanding the mandatory language of the regulation, a tax return may be a joint tax return even though the signature of one spouse is missing, if both spouses intended that the return be a joint tax return.  See Estate of Campbell v. Commissioner, 56 T.C. 1, 12-14 (1971); Federbush v. Commissioner, 34 T.C. 740, 757-758 (1960), affd. 325 F.2d 1, 2 (2d Cir. 1963); Heim v. Commissioner, 27 T.C. 270, 273 (1956), affd. 251 F.2d 44, 46 (8th Cir. 1958).

The question whether both spouses intended to file a joint return is one of fact.  See Estate of Campbell v. Commissioner, 56 T.C. at 12; Heim v. Commissioner, 27 T.C. at 273, 251 F.2d at 46; Helfrich v. Commissioner, 25 T.C. 404, 407 (1955).  The presence or absence of each spouse's signature on the return is a factor to be considered in answering this question, but it is not conclusive.  See Hennen v. Commissioner, 35 T.C. 747, 748 (1961); Howell v. Commissioner, 10 T.C. 859, 866 (1948), affd. 175 F.2d 240 (6th Cir. 1949).

The following considerations point toward a conclusion that Mary intended to file a 1994 joint tax return with petitioner at the time that tax return was filed:  For decades, petitioner prepared and filed joint tax returns for himself and Mary, and this pattern continued until 1997, even though they had separated

in mid-1990.  An element of this pattern, specifically affirmed by Mary in her testimony, was that Mary signed her and petitioner's joint tax returns if she was available when the tax returns were completed, and that petitioner signed the tax returns for her if she was not available when they were completed.  This pattern continued and specifically applied to the 1994 joint tax return, filed on October 16, 1995.[10]  Mary was a teacher, at least from 1990 onward.  For 1994, Mary's Federal income tax withholding was not enough to satisfy the Federal income tax liability on her income; yet Mary did not file a separate 1994 income tax return until 1998, and then only on her attorney's advice.  Not only did Mary not file a separate tax return until years later; Mary cooperated with petitioner's joint tax return efforts by providing her Form W-2 to petitioner, and he both (1) used the information from the Form W-2 in preparing the joint tax return and (2) attached Mary's Form W-2 to the

---

[10]Our comment in Estate of Campbell v. Commissioner, 56 T.C. 1, 13 (1971), applies almost exactly to the situation in the instant case:

> Viewed in this context, the absence of her signature is hardly of overriding importance.  Her signature on prior and subsequent returns appears to have been little more than a formal ritual as far as she was concerned.  She left the responsibility for preparation and filing of the returns to her husband. She intended the returns to be filed as he chose.  We conclude that Mrs. Campbell intended the 1964 return to be filed in the same manner as was each of the others: as a joint return.

joint tax return.  We conclude that both petitioner and Mary intended that the tax return filed on October 16, 1995, be their joint 1994 tax return.

Respondent states on brief several contrary considerations, none of which causes us to change our conclusion.

(1) "Petitioner's spouse filed a separate return for the year 1994, using married, filing separately filing status." Firstly, respondent does not suggest that Mary's separate tax return, filed in 1998, constitutes a valid revocation of a timely filed joint tax return.  See Ladden v. Commissioner, 38 T.C. 530, 533-534 (1962); sec. 1.6013-1(a)(1), Income Tax Regs.  The relevance, then, is the light, if any, that Mary's 1998 filing shines on Mary's intentions when the joint tax return was filed, on October 16, 1995.  We conclude that the circumstances had changed so drastically in August 1997 that Mary's later actions serve primarily to underscore the significance of her essentially unbroken pattern of assent that continued through October 16, 1995, and even past that date.  Secondly, we give greater weight to the fact that, until 1998, Mary did not file a separate tax return even though she had more than $20,000 of Form W-2 income and had an income tax liability in excess of her withholding.

(2)  "At the time the 1994 tax return was filed, there were severe marital problems present in the relationship between petitioner and his wife.  In fact, petitioner and his spouse were

separated and were maintaining separate residences."  Mary testified that (1) after she and petitioner had separated, petitioner continued to pay the bills and file the tax returns as he had done theretofore, and (2) this pattern did not change until August 1997.  Thus, on the facts of the instant case, the separation did not affect the way Mary and petitioner carried out their obligations to file a tax return for 1994.

(3)--

Finally, the Tax Court has stated that "so-called tacit consent rule has been applied * * * only in cases in which respondent was seeking to impose tax liability upon a spouse who had not signed the return, respondent having determined that there was consent to a joint return despite the missing signature."  Hennen v. Commissioner, 35 T.C. 747 (1961).

The Court concluded:

> [W]e cannot agree that tacit consent can be applied where respondent has made a contrary determination, as here.  Tacit consent is only an explanation of the basis for respondent's determination that the absence of one signature is not fatal to a joint return, and has no application unless respondent has made such a determination. The tacit consent rule is not separable from the correctness imputed to respondent's finding of a joint return in cases where one spouse does not sign.

Id. at 749.

Firstly, petitioner has not here invoked the "tacit consent rule", and so should not be charged with the limitations of that rule.  Secondly, the normal burden of proof rules--not some extraordinary burden--apply when a taxpayer contends that the

taxpayer's spouse intended a joint tax return even though the taxpayer's spouse did not sign the tax return. See Lane v. Commissioner, 26 T.C. 405, 408-409 (1956).[11]

---

[11]Our analysis in Klayman v. Commissioner, T.C. Memo. 1979-408, applies very well to the instant case, as follows:

Respondent's second legal argument is related to the first. Respondent contends that the doctrine of tacit consent, pursuant to which we have upheld determinations that a joint return is valid even if not signed by both spouses, applies only in situations in which respondent has determined that the return is a joint return. Respondent contends that he can rely on this doctrine to determine that an unsigned return is a joint return, but that taxpayers cannot rely on a theory of tacit consent to support their claim that an unsigned return is a joint return. In essence, respondent argues that a taxpayer cannot prove that one spouse tacitly consented to the other spouse's filing of a joint return. In support of this position, respondent relies on Hennen v. Commissioner, 35 T.C. 747 (1961), and Parker v. Commissioner, 37 T.C.M. 144, 47 P-H Memo. T.C. par. 78,023 (1978).

Again, respondent's position is without merit. Although Hennen v. Commissioner, supra, does contain language to the effect that the presumption of tacit consent has been applied only upon a determination by respondent, we also stated in Hennen that the tacit consent presumption is only an explanation of the basis for respondent's determination. We held in Hennen that the taxpayer cannot rely on a presumption of tacit consent if respondent determines that no such consent existed. Rather, in such situations the taxpayer must prove that tacit consent existed. Similarly, in Parker v. Commissioner, supra, we held that the presumption of tacit consent was inapplicable when respondent determined that a return was not joint, but the taxpayers were able to prove that one spouse tacitly consented to the filing of joint returns by the other. Indeed, Parker v. Commissioner supports a conclusion directly contradictory to the position respondent has adopted here. See also Lane v. Commissioner, 26 T.C.
(continued...)

We conclude, on the preponderance of the evidence, that the 1994 tax return that petitioner filed on October 16, 1995, was the joint tax return of petitioner and Mary, and that petitioner is entitled to be treated for 1994 as married filing jointly.

Our attention has been drawn to statements in Olpin v. Commissioner, 237 F.3d 1263, 1267 (10th Cir. 2001), revg. T.C. Memo. 1999-426, which, if applied to the instant case, would appear to result in a conclusion that Mary's intentions as to the tax return may be irrelevant. Both sides in the instant case appear to have accepted that petitioner intended to file a joint tax return but that the tax return would not be treated as joint unless Mary also intended it to be joint. Our analysis also has been focused on what the record shows as to Mary's intent. We conclude that the result we have reached on the analysis we used --that petitioner's 1994 tax filing status was married filing jointly--is not different from the result that would be reached under the approach of the Court of Appeals for the Tenth Circuit

---

[11](...continued)
405 (1956) (taxpayer proved that an unsigned return was a joint return).[6]  In this case, respondent does not have the benefit of the presumption of correctness. Compare Hennen v. Commissioner, supra.  However, in reaching our conclusion that petitioners filed joint returns, we have not relied on a presumption of tacit consent; petitioners proved that they intended to file joint returns.

---

[6]  Respondent's position here contradicts his previous acquiescence in our decision in Lane v. Commissioner, supra. See 1956-2 C.B. 7.

in <u>Olpin</u>.  Accordingly, we have no occasion in the instant case to consider whether we should follow the approach set forth in the penultimate paragraph of the opinion of the Court of Appeals for the Tenth Circuit in <u>Olpin</u>.

We hold, for petitioner, that petitioner's 1994 tax filing status was married filing jointly.

To take account of respondent's concession and the foregoing,

<u>Decision will be entered under Rule 155</u>.